Filed 12/16/13  PetRays Veterinary Radiology Consultants v. DVM Insight CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PETRAYS VETERINARY RADIOLOGY CONSULTANTS, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DVM INSIGHT, INC. et al., <br><br> Defendants and Respondents. | D062821 <br><br><br> (Super. Ct. No. 37-2010-00099243-CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Affirmed.

Miller Barondess, Erik S. Syverson and Benjamin Taylor for Plaintiff and Appellant.

Schor & Freeland and Cynthia A. Freeland for Defendants and Respondents.

Plaintiff and appellant PetRays Veterinary Radiology Consultants (PetRays) appeals the trial court's grant of summary judgment in favor of defendants and respondents DVM Insight, Inc. (DVM), Mathew Wright, D.V.M. (Dr. Wright), Animal

Insides, Inc. (AII) and Stephen Walters (Walters) (sometimes collectively, defendants) in PetRay's action for intentional interference with prospective economic advantage, trade libel, false advertising and unfair business practices. Judgment affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Overview*

PetRays provides veterinary telemedicine/teleradiology consulting services. At all times relevant, a veterinary specialist retained by PetRays to service its clients was required to sign PetRays's standard "Proprietary Information and Non-Solicitation Agreement" (noncompete agreement). One of the terms of the noncompete agreement required the specialist to refrain for a period of two years, after either he or she ceased working for PetRays or PetRays ceased servicing a client, from performing services for any such client other than when the specialist was acting on behalf of PetRays (noncompete provision). A veterinary radiologist hired by PetRays to read radiograph images remotely was free to terminate his or her contractual relationship with PetRays at any time and to work for other veterinary telemedicine service providers, subject to the noncompete provision.

DVM also provided teleradiology consulting services under the service name Sight Hound Radiology (Sight Hound). DVM contracted with veterinarians, veterinary clinics and veterinary hospitals to read X-rays for veterinarians. To provide this service, DVM in turn entered into contracts with veterinary radiologists. Veterinary radiologists who read cases for DVM could accept or reject a case based on availability and were free

2

to read X-rays for other teleradiology companies, including PetRays. Unlike PetRays, DVM did not require its veterinary radiologists to sign a covenant not to compete.

For veterinarians and others in the veterinary medicine field that desired to establish their own telemedicine services, DVM offered access to a proprietary software platform (DVM platform). A client that utilized the DVM platform did not need to contract with Sight Hound radiologists to read cases but rather could retain its own radiologists to read cases through the DVM platform. The DVM platform allowed veterinarians to interact with radiologists to facilitate the interpretation of radiograph images.

Dr. Wright at all times relevant was a principal in and the president of DVM. Walters was DVM's computer programmer and a co-owner of DVM. Dr. Wright also was a principal in and the president of AII, a media company. Until September 2011, AII maintained a website on which it posted, among other things, a video and articles about teleradiology.

B. *Dr. Linda Mellema*

Dr. Mellema in 2007 agreed to provide DVM veterinary radiology services. Dr. Mellema worked as an independent contractor for DVM, could accept or reject a case based on her availability and could work for other companies. In July 2009, while working for DVM, Dr. Mellema began working part time as a veterinary radiologist for PetRays. Dr. Mellema signed PetRays's standard noncompete agreement. "In her capacity as a PetRays employee, Dr. Mellema worked scheduled shifts reading cases for

3

PetRays' clients. As a PetRays' employee, Dr. Mellema did not have any marketing responsibility and was not responsible for business development. Her sole responsibility was to read X-rays for PetRays' clients."

In about May 2010, "Dr. Mellema accepted a case through DVM for a [veterinary clinic]. At that time, Anne Bahr, a member of the PetRays team of board-certified veterinary radiology specialists and one of the people to whom Dr. Mellema reported at PetRays [(Dr. Bahr)], called and told Dr. Mellema that she could not read cases for [this clinic] because [it] was a former PetRays[] client and to read for [this clinic] on behalf of DVM would constitute a violation of the provision in Dr. Mellema's [noncompete agreement] . . . ."

Dr. Mellema called Dr. Wright and informed him of her conversation with Dr. Bahr. Dr. Wright responded by email and expressed his regrets about the situation and asked Dr. Mellema about her "comfort level" in reading cases for hospitals that sent cases to PetRays. Dr. Wright also stated his view that the noncompete provision would "not hold up" but recommended Dr. Mellema retain an attorney to be "100% certain."

In response, Dr. Mellema emailed Dr. Wright and stated she had done some Internet research on her own regarding the enforceability of the noncompete provision and, in her view, it would be unenforceable in California. Dr. Mellema told Dr. Wright that her sister-in-law, who was an attorney, was going to look into the issue for her. Dr. Mellema also stated her view that PetRays would have to prove that she caused PetRays

4

"fiscal damage," which she believed PetRays could not do because it seemed unlikely PetRays could show she "made [PetRays] clients leave [its] service."

Dr. Wright responded by email asking that Dr. Mellema let him know what she finds, ostensibly after her sister-in-law looked into the issue, and agreeing with Dr. Mellema that it would be "tough" for PetRays "to prove that you [i.e., Dr. Mellema] caused [PetRays] damage as you only work a few days a week and these clinics left PetRays and you had less than nothing to do with it." Dr. Wright also stated in this email that he "could not resist" writing an article about the "noncompete deals" teleradiologists were being asked to sign and noted he would forward it to Dr. Mellema after his lawyer gave him "the OK."

After considering her conversation with Dr. Bahr and knowing how quickly veterinary clinics and hospitals change ownership, Dr. Mellema concluded that the noncompete agreement "created restrictions that, if enforceable, would be too onerous for [her] in the future." As such, she informed Dr. Bahr she was leaving PetRays.

In notifying Dr. Bahr by email of her intent to leave PetRays, Dr. Mellema said she simply wanted to "be able to sit down in front of her computer when her schedule permitted and to read a case for someone in need." Dr. Mellema further explained that when she signed the noncompete agreement she was "not concerned by its terms because it was never her intention to steal any clients. However, when Dr. Bahr pointed out . . . that [Dr. Mellema] could not read cases for [the clinic] because of its prior affiliation with PetRays, Dr. Mellema realized that there could be hundreds of clinics that previously

5

were PetRays[] clients about which she had no knowledge but which could create a potential problem under the [noncompete] [a]greement if she read for those clinics." As a result, Dr. Mellema's employment with PetRays ended on May 31, 2010.

C. *Dr. Laura Ziegler*

In 2002, Dr. Ziegler commenced work for a university. Through her work, she became familiar with and worked with DVM and Dr. Wright. In 2010, Dr. Ziegler left the university and agreed in May 2010 to provide services to DVM as a veterinary radiologist. Dr. Ziegler also considered employment with PetRays and several other teleradiology companies.

"While discussing employment opportunities with PetRays, Dr. Ziegler was presented with [PetRays's standard noncompete] agreement . . . that contained a provision prohibiting competition [i.e., the noncompete provision]. Dr. Ziegler found the provision to be confusing, concerning and incomprehensible. In particular, the provision read '[c]ontractor [i.e., Dr. Ziegler] agrees that he/she will not . . . solicit or provide services or sell an[y] product in competition with Practice [i.e., PetRays] to any current or former healthcare facility in the Practice provided services during the period that Contractor was employed by the Practice whether in the capacity as a contractor, employee, owner or otherwise with respect to any business conducted by the Practice or any of its affiliates, except for the benefit of the Practice or any of its subsidiaries or affiliates.'" The provision was clarified and, given that Dr. Ziegler was in need of a job, she signed the noncompete agreement containing the noncompetition provision among other terms on

6

June 3, 2010.  Dr. Ziegler also subsequently signed contracts with several other teleradiology companies that either lacked covenants not to compete or contained covenants that were less restrictive than the noncompete provision in the PetRays' agreement.

"After signing the Agreement, but before reading any cases for PetRays, Dr. Ziegler grew very concerned about the restrictive provisions in [that] [a]greement.  Dr. Ziegler spoke to many people with experience in business and contracts, both with and without specific knowledge of teleradiology in general or PetRays specifically, and all cautioned against making commitments to a company with such a restrictive noncompete agreement if alternatives were available.  Having known Dr. Wright for several years, Dr. Ziegler reached out to him to speak, in very general terms, about her concerns about restrictive contract terms without disclosing to him the specific names of the companies with which Dr. Ziegler was considering contracting.  Dr. Ziegler did not provide Dr. Wright with copies of any agreements that she had signed with any teleradiology company.  With respect to PetRays, Dr. Wright suggested that Dr. Ziegler speak with Dr. Linda Mellema about her experience with the noncompetition provision in her contract with PetRays, which Dr. Ziegler did.  Dr. Mellema relayed to Dr. Ziegler that she had been informed by Anne Bahr, that she could not read cases for a particular former client of PetRays because said reading would constitute a violation of Dr. Mellema's noncompetition agreement.

"Because Dr. Ziegler had other contracts at the time, and because the noncompetition provision in the [noncompete agreement] seemed very restrictive to Dr. Ziegler, she decided that it would be best for her to end her relationship with PetRays, which she did in or about June 2010. [¶] Dr. Ziegler never did read any cases for PetRays and did not ever have access to any of its client information.

"Dr. Wright did not provide Dr. Ziegler with legal advice nor did Dr. Ziegler rely on anything that Dr. Wright said to be dispositive of whether the noncompetition provision in [the noncompete agreement] was enforceable. Dr. Ziegler never provided Dr. Wright with a copy of [the noncompete agreement]. Dr. Wright did not induce Dr. Zeigler, either directly or indirectly, to terminate her employment with PetRays. The decision to terminate Dr. Zeigler's employment relationship with PetRays was Dr. Ziegler's alone."

D. *Publication of Materials on AII's Website*

In early 2010, DVM posted on AII's website a video (DVM video). Although this two-minute animated promotional video did not specifically mention PetRays by name, PetRays contends the criticism at the end of the video of the "'big boys'" in the veterinary teleradiology field was directed at it and a few other veterinary teleradiology companies. The DVM video (which was included in the record and independently reviewed by this court) stated that there are a "lot of options" in the teleradiology field and that "many of the other guys" operate their businesses like "robot sweat shop[s]." The video also stated that DVM's competitors provided "nameless, faceless service"; produced "cheap, junky"

8

radiology reports with "wishy-washy" findings; offered "false promises" such as 30-day free trials; and employed inexperienced radiologists who would not commit to a diagnosis, among other statements.

Also in early 2010, AII posted on its website an article written by Dr. Wright titled "Teleradiology is NOT a commodity" (commodity article). This article criticized "commoditized radiology services" that hire "inexperienced and underpaid radiologists" who are "pressured to create wishy[-]washy reports because they need to meet deadlines." The commodity article includes a footnote listing the entities that are *not* "commodity teleradiology services" and notes "there are many others" not on that list. PetRays was omitted from the list. According to PetRays, the commodity article, much like the DVM video, was allegedly directed at it by "clear implication."

Dr. Wright also wrote an article that was posted in 2010 on AII's website entitled "If you sign a 2 year noncompete covenant for cyberspace you are essentially unemployable if you leave your current position" (noncompete article). This article— which ostensibly was the one referenced by Dr. Wright in his email to Dr. Mellema— notes a trend in corporate veterinary teleradiology requiring "employees to sign a contract that includes [a] covenant not to compete with the employer should they ever terminate their employment." It further notes that such covenants are a "problem in our industry"; that in the author's opinion "radiologists who agree to these terms of employment are at a serious disadvantage for a period of two years after they terminate employment with the owner"; that the author is not sure "whether or to what extent" courts will enforce such

9

covenants but that the author "do[es] know that the answer varies from state to state"; and that signing such a covenant "that covers cyberspace, regardless of the legality or enforceability of these contracts, makes you [i.e., the radiologist] essentially unemployable or, at best, puts you at a serious disadvantage" because, among other things, the clients are "fickle when it comes to teleradiology" as they "change providers or they may use multiple providers at the same time for different types of cases," and thus it "is very likely, if not certain, that you will be asked to read for hospitals that sent cases to your former employer."

E.  *Operative Complaint*

PetRays's operative complaint asserted causes of action for intentional interference with prospective economic advantage, trade libel, false advertising and unfair business practices.

PetRays alleged that the video and articles posted by defendants made "numerous false, disparaging and misleading statements about the consulting services offered by PetRays and other companies like it," as discussed *ante*; that "[c]onsumers and companies and professionals within the veterinary medicine industry viewed these comments and understood these comments to refer to [PetRays]"; and that the statements by defendants were "false and misleading and disparage the quality of [PetRays's] goods and services" because, among other things, "[e]ach of PetRays['s] clients has a personal account manager who connects the client with the PetRays[] specialist whose expertise the client seeks" and each diagnostic report is personalized and signed by the PetRays

10

veterinary specialist who created the report and who is available to answer further questions about the report.

PetRays further alleged the defamatory statements by defendants induced consumers, companies and professionals within the veterinary medicine industry not to deal with PetRays, to its financial detriment, and led veterinary radiologists like Drs. Mellema and Ziegler not to work for PetRays.

PetRays also alleged Dr. Wright in 2010 began approaching several of PetRays's veterinary specialists to work for DVM. According to PetRays, Dr. Wright allegedly "began a campaign to cause these specialists to breach or disrupt their contractual and/or non-contractual business relationship" with PetRays and provided these specialists "legal advice . . . without a law license by reviewing their contracts with [PetRays] and providing legal interpretations and advice related to said contracts and the legal effect of said contracts. The conduct by [Dr.] Wright was independently wrongful because, among other things, [Dr.] Wright was engaging in the unlawful and unlicensed practice of law in the state of California in violation of California law and the California Bar Rules of Professional Conduct. Additionally, the conduct by defendants was independently wrongful because, among other things [Dr.] Wright suggested that these specialists steal clients from PetRays" and take them to DVM.

PetRays alleged that after Dr. Wright spoke with Drs. Mellema and Ziegler and "provided them legal advice with regard to their contracts" with PetRays, each doctor

11

terminated her agreement with PetRays so each "would be free to treat former and/or current clients of PetRays on behalf" of DVM.

PetRays in its operative complaint alleged on information and belief that defendants used foreign-based veterinarians with no United States veterinary licenses to provide radiology services in California, among other states, which practice was "unlawful and unfair" inasmuch as it allowed defendants to compete unfairly in the veterinary radiology marketplace by artificially lowering defendants' expenses and by allowing defendants to read radiology reports 24-hours a day, which in turn harmed PetRays because it hired only properly-licensed veterinarians and, as such, its costs and expenses rose in order to compete with defendants.

F. *Summary Judgment*

Defendants moved for summary judgment or, in the alternative, summary adjudication. The court granted the motion for summary judgment, ruling as follows:

"Plaintiff and defendants both provide teleradiology services to veterinarians. [¶] In the 1st cause of action for Intentional Interference with Prospective Economic Advantage plaintiff alleges Sight Hound, DVM Insight and Dr. Wright knew of plaintiff's existing agreements with plaintiff's now former veterinarian radiologists, Drs. Mellema and Ziegler. Dr. Wright, with the approval of DVM and Sight Hound, induced them to terminate their business relationships with plaintiff by engaging in the unlawful practice of law by providing legal advice to Drs. Mellema, [Ziegler] and other veterinary radiologists regarding the legal meanings and effects of their contracts with plaintiff.

12

"Plaintiff also claims that Wright engaged in the unlawful practice of law as part of its 2nd cause of action for unfair business practices.

"B&P § 6125 provides that 'No person shall practice law in California unless the person is an active member of the State Bar.' It is well settled in California that 'practicing law' means more than just appearing in court; it includes legal advice and counsel and the preparation of legal instruments and contracts by which legal rights are secured although such matter may or may not be pending in a court. (Estate of Condon (1998) 65 Cal.App.4th 1138, 1142[.])

"Here, there is direct evidence that Wright did not provide legal advice. Neither Dr. Zeigler nor Dr. Mellema considered the communications with Wright to be legal advice. Dr. Wright did opine that Dr. Mellema's noncompete agreement would not hold up but also advised she should speak to an attorney about it to be 100% certain. (Wright Declaration; Defendants' Exs. J, K; Plaintiff's Exs. 1, 9[.]) That statement is insufficient to create a triable issue whether Dr. Wright was engaging in the unauthorized practice of law.

"Claims based on Wright's alleged practice of law fail because there is no evidence presented to create a triable issue that he was practicing law when he communicated with Drs. Mellema and Ziegler about noncompete agreements, such as the one in plaintiff's contracts. Without an underlying wrong, the cause of action for intentional interference with prospective economic relations fails. (Della Penna v. Toyota Motor Sales, U.S.A.,

13

Inc. (1995) 11 Cal.4th 376, 392-393[.]) Further, to the extent the unfair business practices claim is premised on Dr. Wright's alleged practice of law, it too fails.

"In the 2nd cause of action for unfair business practices, 3rd cause of action for false advertising and 4th cause of action for trade libel, plaintiff alleges that defendants stated on the internet that any radiologist that enters into a contract with plaintiff will be unemployable in the marketplace because plaintiff requires its veterinary radiologists to sign a 2 year noncompete agreement. Defendants allegedly marketed their veterinary teleradiology consulting services to the public in a video and two articles posted on the internet which contain untrue statements and disparage the quality of plaintiff's services.

"There is no dispute that neither the video nor the two articles refer specifically to plaintiff by name. The statement on which the claim is based must specifically refer to or be 'of and concerning' the plaintiff in some way. (Blatty v. New York Times Co. (1986) 42 Cal.3d 1033, 1042[.]) The 'of and concerning' or specific reference requirement limits the right of action only to those that are the direct object of criticism and not those who merely complain of nonspecific statements they believe caused them some hurt. The implication must be clear. (Id. 1044[.])

"In the video, defendants are contrasted against the 'Big Guys' who operate like sweatshops, provide 'wishy-washy reports' and are like factories. The 'Big Boys' advertise and attend trade shows. The 'Commodity' article criticizes commoditized radiology services and concludes with a footnote listing those entities that are not commoditized. Plaintiff is not listed. The 'Non-Compete' article warns against signing a

14

noncompete agreement. Wright opines that a radiologist who agrees to such terms of employment is at a serious disadvantage for a period of two years after they terminate employment with the owner. (Defendants' Exs. A-C[.])

"Plaintiff maintains anyone with knowledge of the veterinary teleradiology industry understood the video and articles to refer to plaintiff. Plaintiff acknowledges there are at least three 'Big Boys' in the industry. Evidence is presented that some wondered if . . . the publications were about plaintiff and vague references to unidentified persons in the industry who understood them to be about plaintiff or referred to several companies, including plaintiff. (Powell Declaration; Wallack Declaration; Defendants' Ex. M; Plaintiff's Ex. 4[.]) The evidence shows only that the publications might be about plaintiff and other companies, which is insufficient to create a triable issue.

"Moreover, both the unfair business practices claim and false advertising claim require plaintiff to show it suffered injury in fact and lost money as a result of the unfair competition or false advertising. (B&P §§ 17204, 17535[.]) Restitution is limited to the return of money or property that was once in the possession of plaintiff. (Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1149[.])

"Although plaintiff claims it lost customers and revenue as a result of the defendants' conduct, it has not produced sufficient evidence to create a triable issue. The court notes that in a deposition on October 10, 2011, Dr. Powell, plaintiff's Person Most Knowledgeable, testified that he did not know anyone that stopped doing business with plaintiff because of the video or anything Dr. Wright said. He had not done any

15

investigation to determine if plaintiff had lost customers and had no documents to show any customers stopped dealing with plaintiff because of anything said by defendants. The video did not affect recruitment. He did not know the names of anyone who understood the articles to refer to plaintiff. In fact, he had no idea how many clients were lost in the last year and had done no analysis of financial harm. He did know that a few customers were lost but had no idea if it was because of anything Dr. Wright did while at the same time acknowledging that some were lost for other unrelated reasons. He also testified a lot of clients left DVM to join plaintiff and that plaintiff's 2010 revenue was up compared to the previous year and continues to grow. This is contrasted with his declaration in which he states plaintiff lost revenue of $1 million. This is based on a spreadsheet showing seven companies who no longer use plaintiff's services, along with their estimated volume, estimated monthly payments and the date lost. This spreadsheet evidence is speculative in that it suggests only an expectant interest rather than a possessory interest to support a restitutionary interest. (Defendants' Ex[s]. G, M; Plaintiff's Ex. 5 at Ex. B[.]) Further, there is no showing that these customers were lost as a result of defendants' conduct.

"In addition, a cause of action for trade libel requires plaintiff to prove special damages, such as loss of prospective contracts with its customers. It is not enough to show a general decline in business from the falsehood even when no other cause is apparent. Plaintiff must identify the particular purchasers who have refrained from

16

dealing with it and specify the transactions of which it claims to have been deprived. (Erlich v. Etner (1964) 224 Cal.App.2d 69, 73-74[.])

"Plaintiff has not shown that any statements made in the video or articles were false or produced sufficient evidence that it suffered special damages as a result to support the claim for trade libel.

"Inasmuch as the unfair business practices is also based on allegations that defendants use[] a foreign veterinary radiologist, provides veterinary services while partially owned by a non-veterinarian and/or uses a trademark without permission, plaintiff has not shown any damages as a result of these allegedly unlawful activities.

"For all these reasons, the claims for unlawful business practices, false advertising and trade libel fail.

"Lastly there is no triable issue as to the personal liability of defendants Dr. Wright or Walters. Defendants acting in their representative capacities as managing agents of defendants corporations are not always immune from liability. Where plaintiff's action is for an intentional tort, all person[s] who are shown to have participated are liable for the full amount of damages. (Golden v. Anderson (1967) 256 Cal.App.2d 714, 719-720[.]) Defendants pled the affirmative defense of privilege in their answer so this defense was not waived. Further, there are no intentional torts remaining. Lastly, although plaintiff argues there is a triable issue whether they were alter egos of the defendant corporations, no evidence has been presented to support an alter ego theory.

17

"This ruling disposes of the case in its entirety.

"IT IS SO ORDERED."

DISCUSSION

A. *Guiding Principles*

Summary judgment is granted when a moving party establishes the right to entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

A defendant moving for summary judgment bears the initial burden of proving that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o)(1), (2); see also *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.) If the defendant makes such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of one or more material facts as to that cause of action or as to a defense to the cause of action. (*Aguilar v. Atlantic Richfield Co*, *supra*, at pp. 850-851.) If the plaintiff does not make such a showing, summary judgment in favor of the defendant is appropriate. In order to obtain a summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action . . . ." (*Id*. at p. 853.)

18

On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]" (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433; see *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 ["responsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"].)

B. *Intentional Interference with Prospective Economic Advantage*

1. Governing Law

To prevail on a claim of intentional interference with prospective economic advantage (interference claim), a plaintiff must show: "'"(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153.)

19

Particularly relevant to the case at bar, in the third element of this tort a plaintiff must show the defendant engaged in an independently wrongful act beyond the act of the interference itself. (*Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, 29 Cal.4th at pp. 1153, 1165.) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (*Id.* at p. 1159; see also *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393.)

Here, PetRays contends it presented sufficient evidence of an independent wrongful act by Dr. Wright (ostensibly on behalf of all defendants)—his alleged unauthorized practice of law in violation of Business and Professions Code section 6125. This statute provides: "No person shall practice law in California unless the person is an active member of the State Bar." According to PetRays, Dr. Wright engaged in the unauthorized practice of law when he communicated with Drs. Mellema and Ziegler about the noncompete provision in their contracts with PetRays.

The term "'practice law'" is not statutorily defined (*Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119, 127-128), and our Supreme Court has "conceded" that "ascertaining whether a particular activity falls within this general definition may be a formidable endeavor" (*Baron v. City of Los Angeles* (1970) 2 Cal.3d 535, 543). The practice of law encompasses activities such as rendering a legal opinion to a client, recommending how a client should proceed, counseling a client regarding his or her legal rights or acting as his or her representative, whether or not a

20

matter is pending before a court. (*State Bar of California v. Superior Court* (1929) 207 Cal. 323, 335; *Benninghoff v. Superior Court* (2006) 136 Cal.App.4th 61, 68.) "In close cases, the courts have determined that the resolution of legal questions for another by advice and action is practicing law 'if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application of a trained legal mind.' [Citations.]" (*Baron v. City of Los Angeles*, *supra*, at p. 543.)

2. <u>Analysis</u>

Initially, we reject PetRays's contention (bordering on the frivolous) that the court erred when it overruled PetRays's objections to the testimony in the declarations of Drs. Mellema and Ziegler that they did not believe Dr. Wright was providing them legal advice when they communicated with him about their noncompete agreements with PetRays because such testimony allegedly lacked foundation and constituted improper expert testimony. Whether (or not) they believed they were seeking legal advice from Dr. Wright and whether (or not) they believed he was providing such advice is clearly germane to the issue of whether Dr. Wright was engaging in the unauthorized practice of law when he communicated with them regarding their noncompete agreements with PetRays. (See, e.g., *Johnston v. Benton* (1925) 73 Cal.App. 565, 569 ["Whenever the question of the intention of a person is at issue, it may be proved by the direct testimony of such person"]; *Cope v. Davison* (1947) 30 Cal.2d 193, 200 ["The state of mind of a person, like the state or condition of the body, is a fact to be proved like any other fact when it is relevant to an issue in the case, and the person himself may testify directly

21

thereto"]; see also *Barragan v. Lopez* (2007) 156 Cal.App.4th 997, 1003 [a court's evidentiary rulings are reviewed for abuse of discretion].)

Turning to the merits and the testimony provided by Dr. Ziegler, the evidence is undisputed that she was confused and concerned by the noncompete provision in the noncompete agreement she signed with PetRays. As such, Dr. Ziegler reached out to *many people* with experience in business and contracts, and all of them cautioned her about entering into a contract with such a restrictive noncompete provision.

In addition, the evidence is undisputed that Dr. Zeigler also reached out to Dr. Wright—and *not* vice versa—regarding her concerns over the noncompete provision. Dr. Wright advised her to speak to Dr. Mellema, which in fact Dr. Ziegler did when she learned that Dr. Bahr from PetRays had called and told Dr. Mellema she could not read a case for DVM because it involved a former client of PetRays. Because Dr. Zeigler had contracts with other radiology companies that either did not include an anti-competition provision or included a provision that was less onerous than the one in the PetRays noncompete agreement, the undisputed evidence shows Dr. Zeigler decided it was in her best interest to end her relationship with PetRays before she read a single case for the company.

Dr. Zeigler also testified under penalty of perjury that she did not rely on anything Dr. Wright "said to be dispositive of whether the non-competition provision in the [noncompete] [a]greement was enforceable"; that she did not provide Dr. Wright with a copy of the PetRays noncompetition agreement before she discussed her concerns about

22

the noncompete provision with him; that "Dr. Wright did not induce [her], either directly or indirectly, to terminate [her] employment with PetRays"; and that the decision to leave PetRays "was [hers] alone."

In light of this undisputed evidence, we conclude AII, DVM and Dr. Wright satisfied their burden of persuasion to show there was no triable issue of material fact with respect to the third element of PetRays's interference claim. (See *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.) As such, the burden then shifted to PetRays to establish by competent and admissible evidence that a triable issue of material fact still remains in connection with this issue. (*Id.* at pp. 850-851.)

In an attempt to satisfy this burden with respect to Dr. Zeigler, PetRays proffered evidence to show that Dr. Wright knew of the existence of the agreement between Dr. Ziegler and PetRays and that he discussed the noncompete provision with her, which it contends is sufficient evidence for the issue of whether he engaged in the unauthorized practice of law to go to the jury. We disagree.

First, mere knowledge of, and even some discussion (albeit in "very general terms") concerning, the existence of the noncompete agreement and/or the noncompete provision between Dr. Ziegler and PetRays in no way supports a finding Dr. Wright was engaged in the unauthorized practice of law. "An issue of fact can only be created by a conflict of evidence. It is not created by 'speculation, conjecture, imagination or guess work.' [Citation.] Further, an issue of fact is not raised by 'cryptic, broadly phrased, and

23

conclusory assertions' [citation], or mere possibilities [citation]." (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196-197.)

Second, even construing the evidence favorably to PetRays (see *Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 189), we conclude it is insufficient to allow the issue of whether Dr. Wright was engaged in the unauthorized practice of law to go to the jury. For example, there is no evidence that Dr. Ziegler was a "client" of Dr. Wright's; that she sought a legal opinion from Dr. Wright regarding the validity of the noncompete provision; that he held himself out as a person with whom Dr. Ziegler could confide and trust to provide her with a legal opinion concerning the validity of the noncompete provision; or that he advised Dr. Ziegler regarding the validity of this or any other provision in the noncompete agreement and/or her legal rights in connection with that agreement. (See *Baron v. City of Los Angeles*, *supra*, 2 Cal.3d at pp. 542-543.)

Thus, on this record we conclude PetRays has failed to proffer sufficient admissible evidence to establish a triable issue of fact showing that Dr. Wright engaged in the unauthorized practice of law in violation of Business and Professions Code section 6125.

Turning next to Dr. Mellema, she testified under penalty of perjury that she left the employ of PetRays because she was unable to read cases for other radiology companies as a result of the noncompete provision and that she realized there could be "hundreds of clinics that previously were PetRays[] clients about which [she] had no knowledge but which could create a potential problem under the Agreement if [she] read for those

24

clinics." Dr. Mellema also testified that she did her own Internet research regarding the enforceability of the noncompete provision; that her sister-in-law, who was an attorney, was going to look into the issue of enforceability for her; that Dr. Wright neither provided her with legal advice nor did she rely on anything he said to be "dispositive of whether the non-competition provision in the Agreement was enforceable"; and that she alone decided to terminate her employment relationship with PetRays and her decision to do so was based on her conversation with Dr. Bahr.

From the foregoing evidence, we also conclude AII, DVM and Dr. Wright satisfied their threshold burden to show there was no triable issue of material fact that Dr. Wright was engaged in the unauthorized practice of law by allegedly advising Dr. Mellema regarding the enforceability, or lack thereof, of the noncompete provision. (See *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850.)

In an attempt to satisfy its burden to establish an issue of material fact (see Code Civ. Proc., § 437c, subd. (p)(1)), PetRays relies on some email exchanges between Drs. Mellema and Wright. In his email, Dr. Wright noted he was "sorry . . . about the PetRays stuff"—ostensibly a reference to Dr. Mellema's conversation with Dr. Bahr—and noted he was not sure what he could do to help Dr. Mellema but to let him know if she believed otherwise. Dr. Wright also asked Dr. Mellema about her "comfort level" in reading cases for former clients of PetRays and, in this context, stated his view that the noncompete provision in the PetRays agreement would "not hold up" but that Dr. Mellema should seek the advice of an attorney to be "100% certain" on this issue.

25

The record shows Dr. Mellema responded by email that she "most likely" would "end up reading cases that [involved] former PetRays['s] clients" because, in her view, PetRays allegedly would have to show she caused them "fiscal damage" to enforce the noncompete provision. Dr. Wright stated in response, "[l]et me know what you find," and agreed with Dr. Mellema that it would be "tough" for PetRays to show Dr. Mellema caused it damage inasmuch as she only worked for the company "a few days a week and these companies left PetRays and you had less than nothing to do with it." Dr. Wright also indicated he had written an article about "noncompete deals" for radiologists.

Liberally construing such evidence in the light most favorable to PetRays (see *Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 420), we nonetheless conclude these statements by Dr. Wright fall well short of establishing a triable issue of fact that he engaged in the unauthorized practice of law in connection with the enforceability of the noncompete provision in PetRays's noncompete agreement. (See *Baron v. City of Los Angeles*, *supra*, 2 Cal.3d at pp. 542-543.) Instead, these statements show that Dr. Wright was interested as a business owner and competitor of PetRays in determining whether Dr. Mellema was willing to continue reading cases for DVM even after Dr. Bahr had told Dr. Mellema that she could not read a case for DVM because the clinic was a former client of PetRays. They also show that Dr. Mellema was seeking legal advice *not* from Dr. Wright but instead from her sister-in-law, after Dr. Mellema had done her own research on the Internet regarding the enforceability of covenants not to compete in Texas and in California.

26

The fact Dr. Wright said it would be "tough" for PetRays to show damages does not establish a triable issue of fact he was engaged in the unauthorized practice of law. When considered in context, Dr. Wright's statement was in response to Dr. Mellema's view as a layperson—based on her own Internet research—that the noncompete provision was unenforceable absent a showing of "fiscal damage" (whatever that term means). Dr. Wright was thus merely agreeing with Dr. Mellema as opposed to providing her with legal advice and otherwise engaging in the practice of law. This conclusion is buttressed by the fact in this same email he also asked Dr. Mellema to let him know what she finds after her sister-in-law, an attorney, looked into the issue, which further shows Dr. Wright was not giving Dr. Mellema legal advice.

Finally, the noncompete article Dr. Wright mentioned in his email also does not establish a triable issue of fact on this issue. Our independent review of this article shows it was not written to provide radiologists general legal advice regarding the enforceability, or lack thereof, of covenants not to compete. Indeed, the noncompete article expressly states that it is not providing any advice regarding whether such covenants will "hold up in court."

Rather, the noncompete article is written from the prospective of a business owner engaged in the teleradiology business, as demonstrated by the article's discussion regarding the reason or reasons a company might not hire a teleradiologist who previously had signed a contract that included a covenant not to compete. We thus independently conclude PetRays did not create a triable issue of fact with respect to the

27

third element of its cause of action for interference with prospective economic advantage and, therefore, summary judgment was properly granted as to this cause of action.

C. *Trade Libel (and False Advertising)*

1. Governing Law and Additional Background

Trade libel is the publication of matter disparaging the quality of another's property that results in pecuniary loss to the plaintiff. (*Leonardini v. Shell Oil Co.* (1989) 216 Cal.App.3d 547, 572.) To constitute trade libel, a statement must be false. (*Ibid.*; see also *Polygram Records, Inc. v. Superior Court* (1985) 170 Cal.App.3d 543, 548.)

Because the gravamen of a trade libel claim is the allegation that the defendant made false statements of fact that injured the plaintiff's business, the "limitations that define the First Amendment's zone of protection" apply. (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042, cert. den. (1988) 485 U.S. 934.) A claim based on an injurious false statement such as trade libel "must specifically refer to, or be 'of and concerning,' the plaintiff in some way." (*Ibid.*)

"The 'of and concerning' or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt. To allow a plaintiff who is not identified, either expressly or by clear implication, to institute such an action poses an unjustifiable threat to society. For example, as a federal court has cautioned, the absence of the 'of and concerning' requirement 'could invite any number of vexatious lawsuits and seriously interfere with

28

public discussion of issues, or groups, which are in the public eye. Statements about a religious, ethnic, or political group could invite thousands of lawsuits from disgruntled members of these groups claiming that the portrayal was inaccurate and thus libelous. Such suits would be especially damaging to the media, and could result in the public receiving less information about topics of general concern.' [Citation.]" (*Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at p. 1044.)

Here, the parties agree the DVM video and the commodity and noncompete articles do *not* expressly mention PetRays by name. However, the parties disagree on whether the DVM video and/or the two articles specifically refer to, and thus are "of and concerning," PetRays by "clear implication." (See *Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at p. 1044.)[1]

We conclude defendants proffered sufficient evidence to satisfy their initial burden of persuasion that there is no merit to this cause of action because of the publications' lack of a specific reference to PetRays and, thus, the burden then shifted to PetRays to

---

[1]    We note from the record that defendants in connection with trade libel did *not* contend in their motion for summary judgment/adjudication that the statements published in the DVM video were merely nonactionable expressions of opinion as opposed to allegations of fact. (See, e.g., *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 837-838 [noting the "issue whether a communication was a statement of fact or opinion 'is a question of law to be decided by the court'" and noting that in "making the distinction, the courts have regarded as opinion any 'broad, unfocused and wholly subjective comment,' [citation] such as that the plaintiff was a 'shady practitioner' [citation] 'crook' [citation], or 'crooked politician' [citation]"]; see also *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1404 [noting phrases about plaintiff such as "'creepazoid attorney' and 'loser wannabe lawyer' are classic rhetorical hyperbole which 'cannot "reasonably [be] interpreted as stating actual facts."' [Citation.]"].)

produce admissible evidence and demonstrate the existence of a triable issue on this issue. (See *Aguilar v. Atlantic Richfield Co*, *supra*, 25 Cal.4th at pp. 850-851.)

PetRays contends the court erred when it found the DVM video and/or the two articles did not identify it by "clear implication" because the "veterinary teleradiology industry is highly specialized and includes so few large companies that any reasonable observer with knowledge of veterinary teleradiology would understand that they refer to PetRays." In support of this contention, PetRays proffered the testimony of Frank Powell (Dr. Powell), a principal and manager of PetRays, and Seth Wallack (Dr. Wallack), a licensed veterinary radiologist who, along with Dr. Wright, founded DVM in 2006.

Dr. Powell testified in 2010 he viewed the DVM video and read the noncompete and commodity articles and understood these publications were referring to PetRays. Dr. Powell further generally testified that through his "conversations with veterinary radiologists" who saw these same publications, he became "aware that others in the industry" also understood these publications to refer to PetRays. Dr. Powell, however, identified only one such veterinary radiologist, Dr. Wallack, that Powell states saw the DVM video and read the noncompete article and believed they (but not the commodity article) referred to PetRays.

Dr. Wallack testified he founded DVM with Dr. Wright in 2006 and sold his interest in DVM to Dr. Wright and Walters in 2009. Dr. Wallack testified he saw the DVM video in 2010 and understood it "to be referring to several teleradiology companies, one of which is PetRays, which was at that time, and remains, one of the

30

biggest companies in the industry."  Dr. Wallack did not testify that he read the noncompete article and understood that article also was referring to PetRays by implication.

2. Analysis

Initially, we reject PetRays's contention that the trial court abused its discretion when it granted summary judgment because the "only proof of a material fact" (see Code Civ. Proc., § 437c, subd. (e)) allegedly offered by defendants that the DVM video and/or the two articles did not refer to PetRays allegedly was Dr. Wright's "state of mind, or lack thereof, and that fact is sought to be established solely by [his] affirmation thereof" (see *ibid.*).  This contention ignores the fact that the DVM video and the two articles themselves do not mention PetRays.  In any event, as discussed *post*, whether Dr. Wright intended or did not intend to refer to PetRays in these publications is largely irrelevant.

Even construing the evidence liberally in favor of PetRays, we conclude it is insufficient to create a triable issue of fact in connection with the specific reference requirement for trade libel.  As the principal and manager of PetRays, we independently conclude Dr. Powell's own subjective belief that the DVM video and/or the two articles referred by "clear implication" to PetRays is of limited significance on the issue of whether the audience to whom these publications were directed—veterinarians and veterinary radiologists—*objectively* understood one or more of these publications referred to PetRays.  (See *Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at p. 1046 [noting the specific reference requirement is based on whether it was "reasonably

31

understood" by readers that the alleged injurious falsehood—failing to include plaintiff's novel on the best-seller list—referred to plaintiff]); see also *Yow v. National Enquirer, Inc.* (E.D.Cal. 2008) 550 F.Supp.2d 1179, 1190 [denying motion to dismiss because it could not "be determined as a matter of law that a *reasonable reader* giving the ordinary meaning to the words of the article[] would not clearly identify Plaintiff" as one of the women who used cocaine with a celebrity in the back of a bar and then took that celebrity to her home (italics added)]; *Barger v. Playboy Enterprises, Inc.* (N.D.Cal. 1993) 564 F.Supp. 1151, 1153 [noting the injurious statement must be "*reasonably susceptible* of special application to a given individual"].)

Regarding Dr. Powell's testimony that he had conversations with veterinary radiologists who allegedly also viewed the DVM video and/or the articles and, based on those conversations, allegedly told him they too understood the video and/or articles referred to PetRays, we conclude that, even if admissible,[2] this evidence also is insufficient to establish a triable issue of material fact on the First Amendment specific reference requirement.  Other than Dr. Wallack, Dr. Powell in his declaration does not identify by name any of the veterinary radiologists he communicated with; the number of

---

[2]    The record shows defendants objected to this portion of Dr. Powell's testimony on several grounds including hearsay and lack of foundation.  The hearsay objection appears well taken.  However, the court overruled these objections as well as *all* others raised by defendants because the objections were not in the format set forth in California Rules of Court, rule 3.1354(b) for written objections.  (Cf. *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1119-1120 [noting that a "motion for summary judgment must be decided on admissible evidence" and noting that "'[m]atters which would be excluded under the rules of evidence if proffered by a witness in a trial as hearsay, conclusions or impermissible opinions, must be disregarded in supporting affidavits'"].)

such individuals he allegedly spoke to; when those communications took place; the context of those communications; and perhaps most importantly, the basis of the alleged collective understanding of such individuals (i.e., veterinary radiologists) with whom he communicated that the alleged injurious statements in the DVM video and/or articles referenced PetRays by "clear implication." (See *Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at p. 1044.)

Turning to Dr. Wallack's testimony, we conclude it too is insufficient to create a triable issue of fact on the specific reference requirement. As noted *ante*, Dr. Wallack testified he saw the DVM video (but neither article) in 2010 and understood it referred to "several teleradiology companies," including PetRays. Dr. Wallack did not testify that he understood any of the alleged injurious statements in the video specifically referred to PetRays, as opposed to the "several" other teleradiology companies he generally referenced.

In any event, the record shows that Dr. Wallack was a *business partner* of Dr. Wright beginning in 2006 and ending in December 2009 and that Dr. Wallack's own company continued to own and use the same trademark DVM was using in DVM's business dealings with clients. Looking at Dr. Wallack's testimony in context (see *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.* (C.D.Cal. 1998) 12 F.Supp.2d 1035, 1045), we conclude the testimony he understood the DVM video referred to PetRays is insufficient to create a triable issue of fact on the overarching issue of whether the audience to whom these publications were directed—veterinarians and veterinary

33

radiologists—*reasonably* understood the alleged injurious statements in this publication referred to PetRays.  (See *Blatty v. New York Times Company*, *supra*, 42 Cal.3d at p. 1046.)

Focusing on the publications themselves, based on our independent review, we conclude they also do not create a triable issue of fact on the First Amendment specific reference requirement.  Assuming for present purposes the commodity article involves allegations of fact as opposed to nonprovable expressions of opinion (see *Copp v. Paxton*, *supra*, 45 Cal.App.4th at p. 837), we conclude the fact that PetRays was not included in a list of companies identified in the article that allegedly do not provide "commodity teleradiology services" does not mean the commodity article was "of or concerning" PetRays, particularly given the fact the article also says "[t]here are many other" teleradiology companies not appearing on the list that are not commoditized.  (See *Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at p. 1044 [the specific reference requirement "limits the right of action for injurious falsehood" by denying relief to "*those who merely complain of nonspecific statements that they believe cause them some hurt*" (italics added)].)

Similarly, the noncompete article is not "of or concerning" PetRays as the article merely contains the opinions of Dr. Wright, its author and then business owner, regarding covenants not to compete and why in *his opinion* such clauses are not a good thing.

Finally, the DVM video—assuming it contains factual statements that can be proven to be true or false as opposed to nonactionable expressions of opinion—also is

34

insufficient to create a triable issue of fact on the specific reference requirement. Our review of the video shows it contrasts the services DVM offered (through its dba Sight Hound) with those of its competitors. In making this comparison, the video refers to its competitors in a variety of ways, including: companies that "advertise"; companies that attend "shows"; companies that send unsolicited facsimile transmissions to an inbox; "many of the other guys"; merely the "other guys"; and finally, at the very end, the "Big Boys." Thus, although PetRays claims it was one of the "Big Boys" referenced in the video, it is clear the video was not so limited and instead identifies many other companies—regardless of whether they are (or are not) "Big Boys" in the industry—as competitors who, according to the video, operate teleradiology businesses less favorably than DVM.[3]

Because the focus of the DVM video is not just limited to a few teleradiology companies but instead potentially includes a vast number of companies operating such businesses, and because of the constitutional limitations placed on injurious falsehood

---

[3] We will assume for purposes of argument only that at all times relevant PetRays was in fact one of the "Big Boys" in the described industry. We note the evidence proffered by PetRays on this issue is less than persuasive, including, by way of example only, its contention that Dr. Wright admitted that the group of "Big Boys" in the industry numbered only six or seven members. In reviewing the record cite given by PetRays to support this alleged admission, we note it is to the first page of Dr. Wright's deposition testimony that he gave on October 7, 2011, as opposed to the exact page where Dr. Wright allegedly testified to this fact, and we further note Dr. Wright was deposed on additional days thereafter. We reviewed in the record multiple pages of Dr. Wright's deposition transcript given over the course of days but could not find support for his alleged admission. (See Cal. Rules of Court, rule 8.204(a)(1)(C) [a brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)

claims that "broadly protect free-expression and free-press values" (see *Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at p. 1043), when considering in context the alleged injurious falsehoods published in the video, we conclude the DVM video is insufficient to raise a triable issue on the specific reference requirement.  We thus independently conclude the grant of summary judgment on this claim was proper.

Moreover, given that PetRays's false advertising cause of action was premised solely on the DVM video and the two articles, as established by the operative complaint, and given our conclusion these publications were not "of or concerning" PetRays, we further conclude the grant of summary judgment on this claim was proper.  That is, there is no triable issue of material fact that PetRays's alleged injury-in-fact or loss of money or property (which we assume for present purposes) "was the result of, i.e., *caused by* the . . . false advertising," inasmuch as that advertising did not expressly or impliedly reference PetRays.  (See *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322; see also *Blatty v. New York Times Co.*, *supra*, 42 Cal.3d at pp. 1042-1043 [noting that "[a]lthough the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: '[t]hat constitutional protection does not depend on the label given the stated cause of action' [citation], and no cause of action 'can claim . . . talismanic immunity from constitutional limitations' (*New York Times Co. v. Sullivan* [(1964)] 376 U.S. [254,] 269)"].)

D.  *Unlawful/Unfair Competition*

California's unfair competition law (UCL) "prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'"  (*Kwikset Corp. v. Superior Court*, *supra*, 51 Cal.4th at p. 320, quoting Bus. & Prof. Code, § 17200.)  "Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' [Citation.]"  (*Kwikset Corp.*, at p. 320.)  A plaintiff has standing to assert a claim under the UCL if the plaintiff "'"has suffered injury in fact and has lost money or property" as a result of unfair competition . . . .'"  (*Id.* at pp. 320-321.)

PetRays's operative complaint alleges the following wrongful acts/unlawful conduct by defendants to support its unlawful competition cause of action brought under Business and Professions Code section 17200 et seq.: their publication of injurious statements of fact in the DVM video and/or the two articles; Dr. Wright's unauthorized practice of law; their interfering with the business relationships of PetRays's radiologists; their use of a trademark registered to a third party; their operation of a veterinary corporation with a non-veterinarian owner (i.e., Walters); and finally, their use of unlicensed foreign-based veterinary radiologists.

In light of our conclusions *ante* that defendants did not interfere with PetRays's prospective economic advantage, Dr. Wright did not engage in the unauthorized practice of law and the publications containing the alleged injurious statements of fact were not "of or concerning" PetRays, we turn to the remaining allegations of unlawful conduct by

37

defendants. We independently conclude defendants proffered sufficient evidence to satisfy their initial burden of persuasion that PetRays lacks standing to pursue its unlawful competition claim. The burden thus shifted to PetRays to produce admissible evidence and demonstrate the existence of any triable issues on the remaining claims. (See *Aguilar v. Atlantic Richfield Co*, *supra*, 25 Cal.4th at pp. 850-851.)

We conclude there is no triable issue of material fact that PetRays sustained an injury in fact caused by defendants' use of a trademark owned by a third party. We reach the same conclusion with respect to the allegation that defendants allegedly operated a veterinary corporation with a non-veterinarian owner (i.e., Walters).

Finally, with regard to defendants' alleged use of a single foreign-based radiologist, which PetRays states (through the declaration of Dr. Powell) caused it to lose "substantial business," we note that PetRays's own operative complaint states that since 2007 it *also* has been providing veterinary telemedicine consulting services 24 hours a day, seven days a week.

In any event, we independently conclude the statements by Dr. Powell that PetRays allegedly lost "substantial business" and was put at a "great disadvantage" by defendants' alleged use of a *single* foreign-based radiologist is insufficient to create a triable issue of fact to show that DVM's alleged unlawful business practice in this instance *caused* PetRays's injury in fact, particularly when PetRays also claims it lost substantial business as a result of the DVM video and/or the two articles. (See *Kwikset Corp. v. Superior Court*, *supra*, 51 Cal.4th at pp. 320-321.) PetRays "cannot avoid

38

summary judgment based on mere speculation and conjecture [citation], but instead must produce admissible evidence raising a triable issue of fact," which we conclude it has not done on this issue. (See *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1524.) Therefore, summary judgment was properly granted on PetRays's unlawful competition claim.[4]

## DISPOSITION

The judgment in favor of defendants DVM, Dr. Wright, AII and Walters is affirmed. Defendants are awarded their costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McINTYRE, J.

---

[4] In light of our conclusion that summary judgment was properly granted as to all claims, whether Dr. Wright and/or Walters are individually liable on any one of those claims- is moot.